Good morning, Your Honors. May it please the Court. My name is William W. Palmer, and I represent the Plaintiff and Appellant, Bank of Stockton, in this appeal. We wish to reserve five minutes of our time to respond to the Appellee's argument. This appeal addresses the remedies that are available to the Plaintiff, Bank of Stockton, for the unauthorized transfer and involuntary liquidation of a portion of its Verizon stockholdings by defendant and appellee, Verizon Communications, Inc. Let me ask the first question, Mr. Palmer. The statute that we're dealing with, Section 3336, requires a proper degree of prudence on the part of the claimant. Now, your client missed what appears to be several dividend payments. Doesn't that demonstrate that your client had failed to exercise a proper degree of prudence in monitoring its investment? No, Your Honor, and first, I would note that the question of a proper degree of prudence was not before the lower court. That would be a question of fact. Secondly, I would note that in Judge Fletcher's case, Siever v. Connell, which I argued, which was also Siever 1 and Siever 2, which I argued in front of Judge Clifton, the court determined that there were serious due process violations. This court discussed the importance of notice and how critical it is that a shareholder such as my client receive the notice that's owed under the federal and state securities laws and under the unclaimed property law itself. In other words, this thought of notice without notice. Well, what notice was required under the federal securities laws for the cheat of this stock? Well, under the federal securities laws, two points, Your Honor. We have the common law and we have the federal and state securities laws themselves. Under Barak v. Blackie and other cases, there's an obligation to That's a 10b-5 case. Excuse me, Your Honor? That's a 10b-5 case. Yes, Your Honor, but I think the point that I'm making is that a corporation and a fiduciary is obligated by law to provide notice to the beneficiary. In this case, we're dealing with a corporation and a shareholder. There are specific duties under the federal and state securities laws and under common law to notify a shareholder of any material fact that has to do with that shareholder's stock holdings. Why wasn't the transfer agent sued here? The transfer agent is the one that apparently misdirected the notice to your client. Yes, Your Honor, and I want to thank you for reading the record carefully. Yes, the computer share, and that's who initially my client almost immediately contacted computer share and said, How did we make this mistake? We've been at the same address for 60 years, and you verified that we're at the same address. How could you transfer stock that is not lost or unclaimed property to the state of California where it would be liquidated? What's the answer? Well, they didn't have an answer. That's the point. And for 15 months before my client finally brought suit, they went back and forth and said, Show us the notice. Show us why this mistake occurred. Or, Your Honor, they asked him to simply reverse the process. And under these unclaimed property laws that we're discussing, under the Azure case, the recent Supreme Court case, Occidental v. Cranston, and the other statutes which I've set forth in the brief. The question is, why doesn't computer share have liability here rather than Verizon? They do, Your Honor. Theoretically, well, they are the agent of Verizon, but we went after the principal. I see. I mean, ultimately, the buck stops with the principal. Now, there's another fact that I find curious in the record, and that is the bank held a substantial additional amount of Verizon stock. Was this all in one account, or was this 43,447 shares in a separate account? The other shares were in a separate account, Your Honor. So this was a discrete account different from the account that held the remainder of the stock in Verizon that the bank held? Yes, Your Honor. You've highlighted a key point, which is, how can a shareholder be declared lost as to one batch of stock with no notice, no due diligence, and then not lost as to the other batch of stock? Theoretically, both shares of stock or both batches should have been sheeted. But wasn't the bank monitoring its dividend receipts? Yes, Your Honor. Well, and when it failed to receive its regular dividend payment, and the dividend payment was essentially the same amount of money throughout this entire period of time, roughly 40 cents a share, when it failed to receive that almost $18,000 dividend payment, didn't that put the bank on notice that there was something amiss? You know, Your Honor, that would be an interesting question of fact, and that's been discussed in a lot of cases in California where we have this kind of inquiry notice. At one point is a beneficiary on notice that there's a problem when the fiduciary itself is not conveying the express notice that's required. I would note that there's a lot of this is a sophisticated holder of stock with a lot of dividends and a lot of stock, and we're talking about what might seem to a lot of money to you and I when I guess was uncaught. But that doesn't dismiss the fact that we are shifting, if we adopt that point of view, we're shifting the burden over the shareholder to begin monitoring, actively monitoring investments. And at what point do you draw the line there? Do we stop at just not getting dividends, or do I have to call my fiduciary every month and make sure my stocks are still in place? So that point of view of this inquiry notice would essentially negate all of the express notice obligations that this corporation had. Counsel, I'd like to turn your attention to remedy. Now, what you received was what turned out to be a very nice price for the shares of stock, and then you got the dividends. And now, under the statute, you're supposed to get an amount sufficient to indemnify the party injured for loss, which is natural, reasonable, and approximate result of the wrongful act. Now, I would think generous price for the stock, plus the dividends, plus interest on the dividends, ought to be an adequate remunerative amount for you to get. Don't you agree? Respectfully, Your Honor, I disagree. And here's why. Well, first, would the dividends qualify as an amount sufficient? The statute? Yes, Judge. Under the ruling of Seaver 2, on which panel Judge Clifton sat, we determined that the State of California would no longer pay interest. So when the stock was transferred to the State of California, my client permanent or lost all property rights to that stock. And that was, in essence, the holding of Seaver 2. I'm summarizing a 26-page decision. You could have replaced that stock at a much lower price and had changed to spare. Well, the rule of law, Your Honor, which was the standard that should be applied in this case and wasn't applied in the lower court, is that the amount is measured by the difference between the contract's liquidation price and the highest intermediate prices reached by the identical contracts during a reasonable period of time. Well, that's an entirely separate issue. Let's assume for the moment that's not the rule of law, because, frankly, I don't think it is in this case. Assuming that it's not, where's the injury suffered by your client? Loss of dividends, Your Honor, because the property rights were severed and sold. Loss of the interest, unnecessary attorney's fees. How do the monetary amounts available to your client, if it repurchased the stock at a lower price because the market tanked and had cash left over, is there anything that indicates that these additional items you're noting aren't covered by the cash that's left over? Yes, Your Honor. What? Respectfully, you're insisting that my client buy back into a crashing market. If we take that point of view. Well, you're complaining that your client should have owned the stock in a crashing market, so he's not making himself any worse off than he was. Your Honor, there's. Your complaint is that your client doesn't have Verizon shares. You could buy Verizon shares. You could buy Verizon shares at a price less than the State sold them for. There's cash left over. Why isn't that enough? How has your client been made worse by what the State did? Because, Your Honor, my client wouldn't have had to spend thousands and thousands of dollars just to get back to this point. Well, if your client had bought the shares, it wouldn't have spent the thousands and thousands of dollars either, now would it? If Verizon had simply reversed the process with a phone call, we wouldn't be here today. You're not answering the question. You're not telling me why the alternative that was available to you wasn't sufficient. You're telling me there are other ways it could have been done, but you're not telling me why the alternative available to your client wasn't sufficient. Two points, Your Honor, to address your question specifically. First, because my client, by law, is entitled to the highest price during that intermediate period. It was trading at $40, $45. We'll come back to that answer. What's the second? Secondly, is a tax issue. My client, once we pay the taxes on this windfall, we're in the red. And why do we have to? Well, but would you have had to pay those taxes? We believe we would have, Your Honor, yes. Well. And we've asserted that from the very beginning. But you didn't take advantage of what Verizon contends is the exchange provision in Section 1033 of the Internal Revenue Code. Your Honor, we pointed out that on its face that two-year time window had already run by the time they brought it to our attention, which was six days after we had filed a lawsuit. And I would like to emphasize to this Court, if we take that approach that every time there's a downturn in the market, I can just send a letter as a corporation to my investor and say, okay, it's time to reinvest back in the market. The price has gone down. You better mitigate your losses or you're going to lose all your securities rights. That's not a very good result here. Now, if I were to ---- I'm just saying to establish entitlement to damages, you've got to show an injury. And sometimes there's no injury. There may be a wrong, but there may not be an injury. In this case, I'm having difficulty figuring out what the injury is. Let me give you two more reasons, Your Honor. There's the issues of Fairpoint and IDRAC. Those were stocks that were spun off by Verizon during that gap period in which the stock was taken and owned by the State of California. So my client never got that stock. And you could assert a claim for the value of that. I mean, you can fairly add up. Okay, what would we have had? But then you have to show monetarily that you're left short. Your Honor, the stock was sold. So as a consequence, there never was a spinoff. The stock was sold, gap period where the State holds the money. We no longer own the stock, so we don't get the spinoffs. We'd have to go back and buy that stock. That's my point. There is a monetary value to that. And why are you unable to calculate what the loss is?  And respectfully, the IDRAC stock came in at $400 a share and then quickly collapsed. My client wouldn't have held that stock. It was a minor issuance of shares. It could have been liquidated immediately. But as a result, they were foreclosed from ever owning that stock. Now, your court might, using the logic I hear now, could say, okay, I could go out and buy the IDRAC stock. It's now worth, what, $30 a share? It was worth $400? Okay, I could buy the IDRAC stock at $30 a share. It will never get back, probably, to $400 a share. Who knows? But if we assume that point of view, all the burden is being shifted to the investor. Now, this is a bank. Well, yes, the investor is the plaintiff, and the plaintiff needs to show damages, needs to show injury. And I'm having trouble figuring out exactly what the injury is. You can give me a hypothetical that may be if my client had sold at a high point, but, in fact, your client had Verizon shares, which it didn't sell. So it's got a tough factual job in demonstrating it would have sold at a high point. I disagree, Your Honor, and I'm running out of time, but I'll make the final point. We never got the stock. It was sold. The Verizon stock on which it was based was sold. So we never received those issuances. We never received the interest because Seaver II ruled there is no interest payment. Well, by the State, it doesn't say that you wouldn't be entitled to it. You can make a claim for it. Thank you, Your Honor. Good morning, Your Honors. Paul Watford for Defendant, Verizon Communications, Inc. I think all of the arguments that Mr. Palmer has made here this morning are answered by a single legal principle. Well, wait a minute. What's the date of conversion? The date of conversion, in our view, is the date of sale, which is March 3, 2006. Well, all right. The price of the stock on March 3, 2006, was $33.95 per share. Correct. All right. And the amount that the bank was tendered by the State was based upon that price. That's correct. Now, you contend that there was no loss because when the bank received the check, it could have repurchased Verizon stock without tax liability. Correct. All right. But the price of Verizon stock on May 20, when the bank received the check from the State, was $37.85. That's correct. So if the bank had gone out and purchased stock, it would have come up with 4,456 fewer shares than it held on the date that you contend was the date of conversion. Correct. Is that not a loss? If the bank had, in fact, purchased the shares on that date, it would have been a loss. And assuming it could show liability, we would have had to pay the difference. That's absolutely right. The bank didn't do that. It held the money, and the market eventually tanked. And when it came into court on September 25, 2008, filed its complaint, and what it said is, I have been injured because I'm not currently holding the Verizon shares today. Not that I would have sold them at some earlier point, say back in March or April of 2006. But isn't this measured from the date that the bank was tendered consideration for the loss? In some cases. It would be May 20, 2008. In some cases, it might be if what the shareholder was complaining about was, I lost out on the opportunity to sell the shares at an earlier point in time. Right? So let's say the bank said, put in evidence, and this is what the district court emphasized, where is the affidavit from your client saying, I would have sold the shares earlier? Well, but the bank's contention here is not that it would have sold the stock, but that it wanted to hold the stock and to continue to hold the stock. Correct. But had we followed your theory through, the bank would have had almost 4,500 fewer shares. If it had purchased back in May of 2008. So why isn't that a loss that the bank suffered? Because it did not, in fact, purchase the shares. It was not out of pocket that difference, right? The difference between 33.95 and, say, 37 or 38 dollars. It wasn't out of pocket that amount. It came into court in September of 2008 and said, the injury we've suffered is that we're not currently holding the shares. And what we said to them is, well, wait a minute. The shares are right over there. You can buy them for less than 33.95. If that's the injury you're complaining about, you can go buy the shares and have enough money left over to cover the lost dividends, to cover the lost spinoff stock, lost interest. All of that would have been covered by the windfall profit that they had. Well, now, when Section 3336 was amended eons ago. Right. And it moved away from this highest intermediate price theory that the former statute had had. That was a reflection of the legislature's view that it wasn't appropriate for someone who was the victim of a conversion to obtain a windfall. Right. All right. Now, isn't your theory that because the bank, sometime in 2009, could have gone out and purchased even more Verizon shares with the $1,475,000 that it was tended, isn't that, in fact, a windfall? It's a reverse windfall. And so aren't you attempting to kind of put the spin on 3336 that your friend Mr. Palmer is attempting to do, but you're trying to do it a reverse spin? I don't think so, Your Honor. 3336 just reflects the basic principle, which has been established throughout the common law for some time now, that a plaintiff is never entitled to recover damages that they could have avoided through reasonable efforts. And that goes for a defendant, too. That is, a defendant cannot wiggle out of a claim simply because some fortuity developed. I don't think we're trying to wiggle out of anything. I think all we're saying is that when you filed your suit in September of 2008, the stock was trading for less, and in some cases substantially less, than the price you got for it from the controller. If what you're complaining about is that you don't today own the shares, go out and buy them in the open market. You'll get you'll have to pay much less than the $1.492 million you got from the controller, and you'll have enough money left over to cover these other. Well, you would agree, would you not, that the bank could not have done anything at all until it learned of the cheat? Correct. All right. And when it learned of the cheat on January 12, 2007, the price of the stock was higher than it had been on the date of the conversion? Correct. So, and as I said before, if the bank, in fact, had gone out and repurchased the shares in the open market for that higher price, and it was eventually able to make themselves liable for the wrongful sale, we would have to cover that difference. I'm not disputing that. All I'm saying, Your Honor, is that they didn't, in fact, buy the shares then. They held on to the check, and whether you want to call it a fortuity or not, the reality remains that by the time they filed suit, the price of Verizon's shares had declined substantially, and they were in a position at that point to make themselves whole without having to come to court. So the basic principle reflected in both 3336 and in just the general common law says that they're not entitled to come into court and claim from us damages that they themselves could have avoided through reasonable efforts. Counsel, opposing counsel talks about the spinoff shares. Are they entitled to compensation for those? Well, yes and no. They're not entitled to compensation for the value that those shares held at the time they were issued. That's what Mr. Palmer was referring to when he said the stock was trading for $400. I don't think, with all due respect to Mr. Palmer, that's even accurate. But let's say that that's true. What they would have to do is come in and present evidence in the form of a declaration from someone at the bank that, in fact, they would have sold the shares. Immediately.  And they never did that. And, again, that's what the district court emphasized, that based on the record before me, what I've got is a record that says you would have held the shares today. And what we pointed out in our motion for summary judgment is that by the time the they had filed suit, the price for IDR and I think it's Fairpoint Communications is the other spinoff, had declined drastically. It was down to, for even the number of shares they would have held had they gotten them, it was a few thousand dollars. That was the ---- Now, they were tendered dividends for this intervening period. Should they also have been tendered shares from this other spinoff? Well, the ---- they did receive some shares of the IDR spinoff. That was in 2006. The later Fairpoint spinoff, which was in 2008, they ---- I don't think they ever got those shares. It was about something like 800 shares. But my point is simply this. By the time we came into court, those 800 shares of Fairpoint were worth, I don't know, a dollar a share. I mean, it was some very negligible amount and much, much less than the sort of windfall that they would have captured had they simply ---- What was the amount, the total amount of dividends that was paid on the 43,000 shares from the date of the ISCHEAT in October 2005 to the date when the State tendered a check? To the bank. It was roughly $180,000. All right. And was the bank tendered that amount of money in the tender by the State? They were tendered a portion of that because, remember, the shares actually were transferred to the State in October of 2005. Correct. They weren't actually sold until March of 2006. So there was at least an additional quarter's worth of dividends, maybe two quarters' worth of dividends that they were entitled to claim and I think did claim eventually from the State. Well, but if the bank had continued to own those shares throughout the entire period, and that's the bank's contention, it would have received the additional $180,000 in dividends, would it not? No, and that's what I was trying to correct. It's less than that. It's about $120,000. Whatever the amount is. Yes. In any event, the bank did not receive dividends during that period of time. Correct. And isn't that part of the damages that the bank suffered? Sure. It would be. Well, then the amount tendered by the State is insufficient to cover that. Correct. But? Do we not then have to reverse to allow this to be corrected? No, because at multiple periods, especially after we sent them a letter in November on November 21st of 2008, we pointed out that if you would buy the shares back today, you would have $323,000 in additional profits that you could do whatever you want with, and it would be more than sufficient to cover those lost dividends that we're talking about. So, again, there's no damage that the bank can point to that's attributable to Verizon's acts. Its damages, if any, are attributable to its own failure to exercise reasonable diligence by repurchasing the shares when it could have. Counsel, has the bank pled adequately a claim for attorneys' fees and expenses that they've been put to because of this whole foul-up? I don't think so, Your Honor. There is the declaration from Mr. D'Antoni, I think is his name. He's the vice president at the bank, in which he asserted that they had paid, I think it was $25,000 in attorneys' fees to that point. That was in February of 2009 to both Mr. Palmer and to another law firm. They make an odd statement in here before they list this. This is on page 37 of their blue brief. It says, the following appellant's money damages incurred as of February 2009, which was prepared by and attached to the declaration, blah, blah, blah, which does not take into account recoverable attorneys' fees and costs, and yet they list in here as expenses paid this $25,000. I'm not quite understanding what's being talked about there. I mean, I won't try to speak for the bank, but our position is that you're not entitled to attorneys' fees incurred in litigation to recover whatever damages you're claiming. I think the conversion statute says you're entitled to fees and costs incurred in trying to get the property back, but I don't think the case law is clear. We're not talking about all of Mr. Palmer's fees in bringing this lawsuit. But in any event, I guess my main submission would be, to the extent they properly allege that $25,000, which all it is is an assertion in Mr. DeTone's declaration, it's, again, within the realm of that $300,000 in additional monies that they would have received had they mitigated properly here. So I don't think that's any basis for the Court to reverse the judgment. And I guess let me just make one more point, unless the Court has any additional questions, about the tax loss. Mr. Palmer asserted it again today, and we tried to point this out in our motion to strike a portion of his reply brief. He's just dead wrong about the timing of the 1033. It's two years from the close of the year in which the shares are sold. So the shares were sold in March of 2006. They had until the end of 2008 to take advantage of the 1033 exchange, and they didn't do so. Mr. Palmer's trying to say that it's two years from the date the shares were transferred to the State, which was in 05, and that's not the case at all. The private letter ruling that we submitted is dead on point and says it's from the sale of the shares. Well, can you take that private letter ruling to the bank, as it were? I don't know that you can cite it as binding authority, but it's a fair reflection of what the IRS's position in these kinds of disputes would be. Thank you, Your Honors. Very quickly, Your Honors, to address some of your concerns and some of the comments from my colleague, what you are hearing is a very opportunistic argument. It is the reverse of the arguments or the policy between. Sure, but that's reality. I mean, I would have loved it if the State had taken my retirement account three years ago. I'd be in Clover today because it's worth a whole lot less than it was then. But that's what happens. Sometimes the reverse happens. Sometimes things get a whole lot worse and the defendant is on the hook for a whole lot more. But we still have the reality of what injury has been suffered, and it's hard to find out what injury has been suffered as a result of this. Wrong may have been done, but that doesn't mean damage resulted. Okay. Well, we have difference of opinion on that point, Your Honor. Our point is, our position is at the moment the stock was transferred to the State, we lost control of the stock. Our position is that during that 15-month period, we tried to we couldn't have replaced the stock if we'd wanted to. It was trading at a higher price. Well, that's a fair enough point, counsel, but the point that Judge Clifton is making, I believe, and I hesitate to speak for a court of appeals judge, but I think the point he's making is, why didn't the bank cash the warrant in May 2008 when it finally received compensation for the loss of the stock? Because, Your Honor, during that period of time, we had not we, my predecessors, had attempted to emphasize to Verizon that they could easily reverse the transaction. They had hoped that by not cashing the check, Verizon would step in and simply reverse the transaction, which would have cost everyone nothing. Was there some rider or provision in the check that this was in full satisfaction of all claims that the bank might have against Verizon? No, Your Honor. Okay. I just have a few seconds left. No, you don't. Okay. Oops, I'm sorry. Excuse me, then. Thank you. Thank you. We thank both counsel for their argument. The case just argued is submitted, and we will take a recess. Thank you. Thank you.
judges: Walker, Fletcher B. , Clifton